**James Arthur Ross, Pro Se'**
S.I.D.#2599830
Two Rivers Corr. Inst.
83911 Beach Access Rd.
Umatilla, OR 97882


## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | | |
|---|---|---|
| **JAMES ARTHUR ROSS,** | ) | **Case No. 2:23-cv-00515-SB** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **PLAINTIFF'S PRO SE FIRST** |
| | ) | **AMENDED COMPLAINT** |
| STATE OF OREGON; HEIDI STEWART; | ) | |
| WARREN ROBERTS; JOE BUGHER; | ) | |
| MARCIA VENTURA; KAYCIE THOMPSON; | ) | Civil Rights Action (42 U.S.C. § 1983); |
| ERIN REYES; PATRICK MANEY; ROGER | ) | Negligence |
| BLAIR; D. WETTLAUFER; C. SCOTT; | ) | |
| S. JOHNSTON. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendant(s).** | ) | |
| | ) | |


## FIRST AMENDED PRO SE COMPLAINT FOR CIVIL RIGHTS VIOLATIONS

**COMES NOW**, James Arthur Ross, the above-named Plaintiff, pro se, and respectfully brings

forth this Complaint and alleges as follows:

## INTRODUCTION

This case is a civil rights and negligence action against the above-named Defendants for their

willful and/or deliberately indifferent and/or negligent treatment afforded to a prisoner of the Oregon

Department of Corrections ("ODOC") in the face of his serious medical needs and their targeted campaign of retaliatory actions against him for his protected conduct as a prison advocate and for his efforts to seek redress of his grievances and access the courts in his own case.

This case is brought under 42 U.S.C. § 1983 and pertains to a grievous violation of the Plaintiff's civil rights while incarcerated within ODOC at the Two Rivers Correctional Institution ("TRCI").

More specifically, Mr. Ross suffered a wrist navicular fracture in his right-dominant-hand that went untreated for an astonishing 73 days, constituting cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

Additionally, Mr. Ross has continued to suffer from substantial complications, limitations, pain and suffering effecting his every day abilities that has been blatantly ignored by the Defendants, and each of them.

Furthermore, every time that Mr. Ross has sought to push the issues for his medical treatment, he has been retaliated against in one way or another. Such retaliatory actions include prisons transfers and forcing Mr. Ross to work with blatant disregard for his serious injury, which has also led to the recent need for this Honorable Court's early intervention in the form of a TRO [26] to prevent further harm, pain and suffering to his person by the reckless actions, negligence and blatant deliberate indifference with callous disregard as to his serious medical needs being forced upon him in the face of retaliatory and disciplinary punishment, by the Defendants, and each of them.

At the time of the filing of this First Amended Complaint, plaintiff has been denied any ADA accommodations, physical therapy, pain medication or any real follow-up medical treatment[1].

This case concerns a contemporary standard level of care and decency. Defendants' failures in

---

[1] This honorable court's granting of the TRO [26] has prompted the Defendants to acknowledge Plaintiff's pain and suffering and some actions are being taken in this regard. The totality and extent of these actions are still yet to be seen. However, plaintiff has still not been provided any other accommodations for his injury.

these regards, including their failures to provide persons trained in the medical field of which they are treating, with follow-up care and physical therapy, are in direct violation of the US Constitution, Federal and Oregon Law and has caused Mr. Ross irreparable harm and prejudice as a result.

Mr. Ross believes that throughout this case, he will be able to show a long history and pattern of the Defendants', and each of them', willingness to retaliate, prolong, if not ignore, lie and manipulate in order to refuse medical treatment to its Adults in Custody ("AIC"), including Mr. Ross, with deliberate indifference and callous disregard to his serious medical needs resulting in irreparable harm and prejudice.

Mr. Ross, has been subjected to haphazard and negligent policies and practices by the above-named Defendant(s), and, that their actions, retaliatory actions, failures, negligence, outright deliberate indifference with callous disregard to Mr. Ross's serious medical needs and overall safety and security, have violated Mr. Ross's Constitutional rights and he has suffered irreparable harm and prejudice as a result.

Mr. Ross seeks relief for Damages caused to him as a result of all of this and for the Defendants', and each of them', targeted campaign of retaliatory actions against him for the filing of his grievances over these issues aimed at *interfering* with, and in an effort to *chill*, his abilities to seek redress in the courts.

## JURISDICTION

1.      This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), (4), and supplemental jurisdiction of the State tort claim under 28 U.S.C. § 1367.

## VENUE

2.      Venue is proper within the district of Oregon, because the events giving rise to this claim

occurred in this judicial district and all Defendants reside in this judicial district. 28 U.S.C. § 1391(b).

The acts and practices alleged herein have occurred and continue to occur in prisons operated by ODOC

in many counties across the State of Oregon. The acts pertaining to the named Plaintiff occurred in

Umatilla County, Oregon. The main policy and operational decisions made by ODOC occur in Marion

County, Oregon.

## PARTIES

3.      Plaintiff, James Arthur Ross, is a prisoner at the Two Rivers Correctional Institution

("TRCI") in Umatilla, Oregon.  On April 10, 2021, Mr. Ross fell and broke the Navicular bone in his

right hand at TRCI. Despite the need of a surgery being identified, Mr. Ross did not receive said surgery

until over 70+ days later. All of the specifics of this is laid out under Basis for Jurisdiction and Factual

Allegations section below, and, Mr. Ross re-alleges them as fully set forth herein.

4.      Defendant State of Oregon ("the State"), is a sovereign State entity within the United

States with the capacity to sue and be sued pursuant to the Oregon Tort Claims Act. The Oregon

Department of Corrections ("ODOC") is a department or division of the State. The State is liable in a

State tort action for the actions or inactions of its agents and, as such, is also directly responsible for the

security, safety and welfare of all adults in custody ("AIC") under its authority and supervision,

including the plaintiff.

5.      Defendant Heidi Stewart is the Director of ODOC and is directly responsible for ensuring

that ODOC's prison health programs complies with state and federal laws and, as such, is also directly

responsible for the security, safety and welfare of all AICs under her authority and supervision,

including the plaintiff. ODOC operates 14 facilities in Oregon, where prisoners are held after sentencing if the length of their sentence exceeds one year. At all times relevant, Defendant Stewart was acting under color of law and is sued in her official and individual capacities.

6.      Defendant Warren Roberts, M.D., F.A.A.D.S., is the Director of Health Services for ODOC and is directly responsible for the provision of legally mandated medical, dental, behavioral, and mental health care, and pharmacy services for AICs at all ODOC facilities and, as such, is also directly responsible for the security, safety and welfare of all AICs under his authority and supervision, including the plaintiff. At all times relevant, Defendant Roberts was acting under color of law and is sued in his official and individual capacities.

7.      Defendant Joe Bugher is the Assistant Director of Health Services for ODOC and is directly responsible for the provision of legally mandated medical, dental, behavioral, and mental health care, and pharmacy services for AICs at all ODOC facilities and, as such, is also directly responsible for the security, safety and welfare of all AICs under his authority and supervision, including the plaintiff. At all times relevant, Defendant Bugher was aware of Plaintiff's serious security and medical needs/concerns and acted with deliberate indifference and callous disregard for them. At all times relevant, Defendant Bugher was acting under color of law and is sued in his official and individual capacities.

8.      Defendant Marcia G. Ventura is the Statewide ADA Manager for ODOC and is directly responsible for overseeing and implementing the Americans with Disabilities Act, its provisions and services rendered to all AICs in all ODOC facilities and, as such, is also directly responsible for the security, safety and welfare of all AICs under her authority and supervision, including the plaintiff. At all times relevant, Defendant Ventura was aware of Plaintiff's serious security and medical needs/concerns and acted with deliberate indifference and callous disregard for them. At all times relevant, Defendant

Ventura was acting under color of law and is sued in her official and individual capacities.

9.    Defendant Kaycie Thompson is the Statewide ADA Manager for TRCI and is directly responsible for overseeing and implementing the Americans with Disabilities Act, its provisions and services rendered to all AICs at TRCI and, as such, is also directly responsible for the security, safety and welfare of all AICs under her authority and supervision, including the plaintiff. At all times relevant, Defendant Thompson was aware of Plaintiff's serious security and medical needs/concerns and acted with deliberate indifference and callous disregard for them. At all times relevant, Defendant Thompson was acting under color of law and is sued in her official and individual capacities.

10.    Defendant Erin Reyes is the Superintendent of TRCI and is directly responsible for the operations of TRCI and, as such, is also directly responsible for the security, safety and welfare of all AICs under her authority and supervision, including the plaintiff. Additionally, Defendant Reyes specifically refused to provide or allow the plaintiff a NEO device or 11" Securebook to aide him, because she "did not want petitioner to sue her better". At all times relevant, Defendant Reyes was aware of Plaintiff's serious security and medical needs/concerns and acted with deliberate indifference and callous disregard for them. At all times relevant, Defendant Reyes was acting under color of law and is sued in her official and individual capacities.

11.    Defendant Patrick Harold Maney, A.G.N.P., is the Petitioner's Care Provider at TRCI and is directly responsible for the provision of legally mandated medical, dental, behavioral, and mental health care, and pharmacy services provided to AICs at TRCI and, as such, is also directly responsible for the security, safety and welfare of all AICs under his authority and supervision, including the plaintiff. At all times relevant, Defendant Maney was aware of Plaintiff's serious security and medical needs/concerns and acted with deliberate indifference and callous disregard for them. At all times relevant, Defendant Maney was acting under color of law and is sued in his official and individual

capacities.

12.     Defendant Roger Blair, M.D., is the Radiologist whom contracts with the State of Oregon, ODOC and TRCI and is directly responsible for performing, overseeing and interpreting x-rays that have been performed on AICs housed at TRCI, including the petitioner. At all times relevant, Defendant Blair was aware of Plaintiff's serious security and medical needs/concerns and acted with deliberate indifference and callous disregard for them. At all times relevant, Defendant Blair was acting under color of law and is sued in his official and individual capacities.

13.     Defendant D. Wettlaufer, R.N., is the Medical Services Manager at TRCI and is directly responsible for the provision of legally mandated medical, dental, behavioral, and mental health care, and pharmacy services provided to AICs at TRCI and, as such, is also directly responsible for the security, safety and welfare of all AICs under her authority and supervision, including the plaintiff.  At all times relevant, Defendant Wettlaufer was aware of Plaintiff's serious security and medical needs/concerns and acted with deliberate indifference and callous disregard for them. At all times relevant, Defendant Wettlaufer was acting under color of law and is sued in her official and individual capacities.

14.     Defendant C. Scott, R.N., is a Registered Nurse and a Supervisor for Medical at TRCI and is directly responsible for the provision of legally mandated medical, dental, behavioral, and mental health care, and pharmacy services provided to AICs at TRCI and, as such, is also directly responsible for the security, safety and welfare of all AICs under her authority and supervision, including the plaintiff. At all times relevant, Defendant Scott was aware of Plaintiff's serious security and medical needs/concerns and acted with deliberate indifference and callous disregard for them. At all times relevant, Defendant Scott was acting under color of law and is sued in her official and individual capacities.

15.    Defendant S. Johnston, is a Register Nurse for Medical at TRCI and is directly responsible for the provision of legally mandated medical, dental, behavioral, and mental health care, and pharmacy services provided to AICs at TRCI and, as such, is also directly responsible for the security, safety and welfare of all AICs under her authority and supervision, including the plaintiff. At all times relevant, Defendant Scott was aware of Plaintiff's serious security and medical needs/concerns and acted with deliberate indifference and callous disregard for them. At all times relevant, Defendant Johnston was acting under color of law and is sued in her official and individual capacities.

## BASIS FOR JURISDICTION

16.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. As such, Plaintiff is alleging that his following rights, privileges, or immunities secured by the Constitutions and state and federal laws have been violated:

> 1St Amendment of the U.S. Constitution, including retaliation and access-to-courts;
> 8th Amendment of the U.S. Constitution;
> 14th Amendment of the U.S. Constitution due process, equal protections and reformation; Rehabilitation and Negligence as well as the Americans with Disabilities Act (ADA) of 1990 §§ 3, 202, 42 U.S.C.A. §§ 12102(1)(A), 12132, Rehabilitation Act, 28 C.F.R. § 35.108, § 35.108 (d)(1)(vi) and Oregon's Laws, Human Rights Laws and its Constitutional equivalents to all of the above cited/stated.

## EXHAUSTION OF REMEDIES

17.    Plaintiff exhausted all of his Administrative Remedies of these matters through the Prison's Grievances Processes, OAR 291-109-0100 to 291-109-0250. Plaintiff fully completed this Administrative Process and any further Exhaustion Requirement by filing a Notice of Tort with the Department of Administrative Service Enterprise Goods & Services Risk Management Unit.

## FACTUAL ALLEGATIONS

18.    Plaintiff realleges and incorporates paragraphs 1 through 16 as if fully set forth herein.

19.    Plaintiff, suffered a wrist navicular fracture in his right-dominant-hand that went untreated for an astonishing 73 days, constituting cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

20.    A wrist navicular fracture constitutes a serious medical condition. The pain and potential for long-term complication, such as nonunion, malunion, chronic pain, arthritis and/or carputunnel, are well-established in the Orthopedic field of medical study and research. Delays in treatment substantially increase the risk of permanent damage and are inconsistent with contemporary standards of decency.

21.    The longer a wrist fracture is left untreated, the more challenging it can be to realign and stabilize the bone fragments properly. Delayed surgery may result in delayed or impaired healing. The idea that a delay in treatment for a wrist navicular fracture will, more likely than not, lead to irreparable harm, is a well-recognized principle in Orthopedic Medicine. Clinical studies, medical textbooks and other orthopedic literature, have documented the importance of timely intervention for wrist fractures, specifically including those of the navicular bone, due to its potential for bone death[2].

22.    Within 10-14 days after breaking a bone, the healing process, fibrosis tissues, etc., starts to take place. Thus, a surgery performed after this process begins, will more likely than not, cause irreparable harm as described throughout this complaint.

23.    In general, Orthopedic Surgeons aim to perform surgery as soon as possible for wrist navicular fractures. Prompt surgery, ideally within the first 1-2 weeks after the injury, will significantly reduce the risk of complications and improve the chances of successful healing. Studies and clinical

---

[2] PubMed Database: A Comprehensive Source of Medical Literature; see also The Journal of Hand Surgery; The Journal of Bone and Joint Surgery and The Journal of Orthopedic Trauma.

\

guidelines often emphasize the importance of early intervention to optimize outcomes[3].

24.    Prolonged delays in receiving treatment or having surgery, especially beyond several weeks or months, will increase the risk of complications and potentially result in "irreparable harm" in *most* cases. Such harm could manifest as permanent wrist instability, arthritis, carputunnel and/or long-term functional limitations[4].

25.    On April 10th, 2021, at approx. 2:30 pm, during the permitted afternoon recreation yard time allotted to AICs at TRCI on housing unit 12, plaintiff was playing basketball with some of his fellow AICs. At some point during this game, plaintiff was forcefully knocked down to the ground by another AIC whom was playing rough and charging[5] towards the basket. In an attempt to catch himself as he fell backwards from this other AIC trying to run-through-him, Plaintiff's right hand was caught between the impact of his body and his body hitting the ground.

26.    On the morning of April 12th, 2021, at approx. 7:30 am, Plaintiff reported to his work assignment in the Oregon Corrections Enterprises' ("OCE") Laundry, which operates within TRCI as he was required to do. However, OCE Laundry Coordinator, Ms. Romero, noticed that Plaintiff's right hand was bruised and extremely swollen. As a result, Ms. Romero sent plaintiff to medical to be examined.

27.    On the morning of April 12th, 2021, at approx. 7:45 am, the plaintiff was given an x-ray of his right-dominant-hand. At this time, plaintiff was not physically evaluated by anyone other than the on-site radiologist performing the x-ray, Ms. Davis. Rather, plaintiff was simply given an x-ray, which

---

[3] *Id.*

[4] DiGiovanni CW. Fractures of the Navicular Foot Ankle Clin. 2004 Mar; 9(1): 25-63.doj:10.1016/51083(03)00173-6.

[5] TRCI recreational yards are not "physically" supervised by any correctional officer. Instead, there is 1-2 cameras positioned on the individual yards that do not cover the entire yard. They also do not provide sound. This allows for AICs to build up anger throughout, per se, a basketball game. AICs, just like any human beings, have emotions and those emotions are capable of getting out of hand, especially if the person is losing. That is when unsportsmanlike conduct and unnecessary roughness comes into play, even in professional sports. That is what happened here, when the other AIC decided to force his way through the Plaintiff's body knocking him to the ground in an extreme and violent manner. Whereas, if a correctional officer had been present, that correctional officer could have seen the progression of anger of this other AIC and could have addressed it, ultimately, preventing this from happening in the first place.

was reviewed by Defendants Roger P. Blair, M.D., Diagnostic Radiology, and, Patrick Harold Maney, AGNP, Plaintiff's assigned Care Provider at TRCI. They both informed plaintiff that nothing was wrong, gave him a wrist/forearm brace, ace wrap and told him to use ice to bring the swelling down in his right hand while returning him back to his housing unit. While again, acknowledging that *neither of them had actually seen the plaintiff in person*. Rather, they were simply relaying the information through a third-party (nurse) while the plaintiff was waiting in medical to be informed of the results of his x-ray.

28.     On April 14th, 2021, plaintiff was called back down to TRCI medical where Nurse Tiffany informed him that she had been in contact with an Orthopedic Surgeon, Richard Carpenter, M.D., Motion Orthopedics PC, Hermiston, Oregon, and that Dr. Carpenter instructed her to inform the plaintiff that "he had broken the one bone in his hand that he did not want to break as it is the one bone that is highly prone to dying". However, that "Dr. Carpenter felt over 95% confident that if the plaintiff was to have surgery, Dr. Carpenter could fix it and the plaintiff would have a full recovery". Therefore, Dr. Carpenter stated to the plaintiff, through Nurse Tiffany, that "he had two choices 1) Do nothing and the bone will most likely die and then the plaintiff would have all of the complications, pain and suffering that goes with that; or 2) Have the surgery and allow Dr. Carpenter to do his best to fix it". Therefore, the plaintiff told Nurse (Tiffany?) that "to him, that really is not an option as he did not want his bones to die. That he had to have the surgery". And, Nurse Tiffany responded "Great, I will get the paperwork sorted and get you ready, because Dr. Carpenter wants you out there within the week". The plaintiff specifically asked Nurse Tiffany what day that he could expect to be going out for surgery and she responded "I cannot tell you the exact day for security reasons, however, it will be a day-trip and it will be within the week, because this has to be fixed right away and Dr. Carpenter wants you out there as soon as possible".

29.     The contact that plaintiff described above in section 28, was the last real physical contact

that the plaintiff had with anyone for months leading up to his extremely delayed surgery 73+ days later, which the plaintiff believes only happened because he had filed a grievance on the matter (#TRCI-2021-05-021) as, just stated, he was originally told of the severity of his injury and the imminent need for surgery "within the week" and he was frustrated at being delayed far beyond that point. Especially, since plaintiff witnessed several other AICs going out for doctor and hospital visits, evaluations and surgeries.

30.      Throughout the period of time waiting for his surgery, plaintiff repeatedly sought pain medication for the extreme and substantial pain that he was suffering from due to his broken right hand and the additional fact that the cast that TRCI Medical put on his right hand, was extremely tight and it covered his whole hand from the middle of his forearm to the tips of his fingers.

31.      On multiple occasions, and due to the additional pain it was causing plaintiff and Plaintiff's mental health issues with claustrophobia, plaintiff begged TRCI's medical personnel to change (redo) the cast to loosen it up and to just cover the affected area or, *alternatively*, to just put a splint and ace wrap on it until he had surgery, as they originally had done. As far as "support" for the affected area goes, the splint and ace wrap offered the same exact support as the cast did as it was specifically formed to Plaintiff's forearm and hand for that very reason. It allowed the Plaintiff's fingers to move and breathe while keeping his thumb and wrist locked into position as it was formed to do. The only difference was that it did not cover the Plaintiff's whole hand and fingers like the cast did and obviously, the splint and ace wrap were removable. Albeit, plaintiff had no intent on removing it.

32.      However, while refusing to acknowledge that the plaintiff said "*alternatively*" (meaning, redo the cast or other), plaintiff was constantly told "no, that his hand needs to heal and the cast is the best way to do that". In response to this, the plaintiff said that "he thought that they did not want it to heal before having surgery as any healing would have to be damaged again during surgery, causing him even more long-term problems".

33.     Ultimately, plaintiff was threatened that if he took the cast off, he would be refused any surgery. Thus, while being refused pain medication and at an extreme emotional, mental, physical discomfort with substantial pain and suffering, plaintiff complied out of fear of being refused his surgery.

34.     As a result of all of the above, as well as due to Plaintiff's mental health issues with claustrophobia, plaintiff had suffered many nights of unrest, panic attacks and pacing back and forth in his cell, because the pain and mental/psychological trauma was substantial and unbearable.

35.     During all of this, plaintiff was constantly refused any pain medications of any real potency and effect and was instead told to take Ibuprofen and Tylenol on intervals to deal with the pain[6], which plaintiff told the Defendants that it did not help him with his pain and was and, probably has, caused him severe damage to his stomach, kidneys and liver, which plaintiff fully intends to prove at trial as well. A lot of this interaction was with Defendants 11, 13, 14 and 15, but not limited to.

36.     On May 18th, 2021, approx. 38 days after the initial injury and after the filing of Plaintiff's grievance, plaintiff had his first visit with Dr. Carpenter. At this visit, Dr. Carpenter had his radiologist perform an on-site x-ray of the Plaintiff's right-dominant-hand.

37.     During the above mention visit an x-ray in section 35 above, the transport officers were in the room with the plaintiff during this procedure. They were looking at the results of Plaintiff's x-ray with the radiologist and they asked the radiologist "is it broken?". In response to the transport Officer's question, the radiologist said "Oh yeah, it's broken alright" and continued to show them the breaks and one of the officers responded "damn, I guess it is", as if there was some question as to that fact.

38.     After the x-ray was performed as mentioned in section 35 and 36 above, Dr. Carpenter came into the room with the results and showed it to the plaintiff on a "tablet thing". Dr. Carpenter was

---

[6] Noting that Ibuprofen and Tylenol are readily available to all AICs on their individual housing units. It is not a "prescribed" medication. It is freely handed out to all AICs for *any* reason.

showing the plaintiff the "new age" technology (digital), which as a prisoner, like the plaintiff, does not

get exposed to like people in the outside world. Dr. Carpenter showed plaintiff that his hand was clearly

broken and the plaintiff could see it, just as the transport officers did, as it was clear and obvious,

leaving serious questions as to how this was ever missed by Defendants Blair and Maney in the first

place.

39.     The x-ray also showed that the break in the navicular bone was *displaced*, meaning no

longer aligned.

40.     As a result of the displacement of the breakage of the navicular bone in the Plaintiff's

right hand as mentioned above, Dr. Carpenter told the plaintiff that he "could not do a *close* operation,

which would have been a little incision". Dr. Carpenter stated that he "would have to do what's called an

*open* surgery". That "he would have to open the whole thing up to properly re-align the bones and to

insert the screws". That "it would leave a bigger scar", which it did, about 2 inches long, but "without

surgery, the bone would die and cause him serious complications". Obviously, and yet again, the

plaintiff chose the surgery over the alternative, which was truly the only reasonable and logical solution

over the alternative. Plaintiff just thinks that no one wanted to give him the surgery in the first place and

that is why the Defendants were lying to him about the injury in the first place.

41.     During the above-mentioned visit on May 18th, 2021, Plaintiff also asked Dr. Carpenter

about alternative pain medications rather than taking substantial amounts of Ibuprofen and Tylenol

indefinitely. Dr. Carpenter told the plaintiff that "pain management is handled by the Institution's

medical. However, I will say something about it to them". It should be noted here, that Dr. Carpenter did

have his assistant put a new cast on Plaintiff's wrist that left Plaintiff's fingers and knuckles open, while

securing the thumb, wrist and forearm are to help relieve some of the pain and mental/psychological

trauma that the prior cast was causing the plaintiff as described above.

42.    Additionally, the plaintiff was able to obtain a brief 5-6-day prescription of Tramadol immediately after the visit with Dr. Carpenter mentioned throughout sections 34-39 above.

43.    However, as it became vastly apparent that Plaintiff's surgery was not imminent and with deliberate indifference to his serious medical needs, the Defendants took plaintiff off of the Tramadol and refused any other alternative. Again, telling the plaintiff that he could take Ibuprofen and Tylenol offered on his housing unit, see footnote 6.

44.    It appears that the Defendants have a policy of not providing prescribed medications unless they are forced to do so or they are sued into doing so and, that once they do, they look for any opening to take it away. A pattern that the plaintiff intends to fully prove at trial.

45.    As mentioned above, out of over 73+ days of the plaintiff waiting for surgery, plaintiff only received the brief and extremely limited prescription of actual pain relief in the middle of it (Tramadol). More specifically, it took plaintiff almost 2 months after breaking his right hand to even get the Defendants, and each of them, to acknowledge his pain and suffering and provide him said prescription, which they did, it was only for them to turn around and take it away from him a few days later and, astonishingly here, a month before plaintiff was to even have his surgery. Yet, Plaintiff's situation had not changed at all, i.e., hand still broken, still waiting for surgery and still suffering from the substantial pain caused by the breakage of his right hand.

46.    On several occasions, the plaintiff tried speaking to and kyting several Nurses about all of the above and Plaintiff's pain management, including defendants Scott, Johnston, Wettlaufer and Maney, all to no avail.

47.    Plaintiff was constantly told by the Defendants, and each of them, that he was "scheduled for surgery and that he would be going out soon and that the cast was sufficient for his pain management", paraphrasing.

48.      However, the term "soon" turned into months of waiting, pain and suffering and begging other AICs to help him with his food trays, beverages, clothes, dressing himself, writing, especially his confidential and legal matters concerning his legal (civil and criminal) cases and his medical communications and forms (HIPPA violations) as the Defendants, and each of them, would not aide him in any way shape or form nor provide him with any alternative forms of assistance, whether it be ADA or not.

49.      On multiple occasions, the plaintiff wrote (with the assistance of other AICs writing for him) to all of the Defendants, including to TRCI's ADA Coordinator Kaycie Thompson and ODOC's Statewide ADA Coordinator Marcia G. Ventura. They all told the plaintiff "to do self-care and that his injury or situation did not warrant any assistance and that he did not, and, does not, qualify for any ADA accommodations either". A pattern that continues at the time of the filing of this First Amended Pro Se Complaint.

50.      Plaintiff has also personally spoken about all of the above with TRCI Superintendents Tyler Blewett and Erin Reyes as well as Operations Captain Archer, all to no avail.

51.      Plaintiff's temporary and permanent *disabilities* associated with having his dominant-right-hand broken and the pain and suffering from it, has caused him to miss deadlines in the filings of many of his grievances, legal cases, including this one, as well as substantially affecting, hindering and preventing many of his other normal daily and recreational activities like, but not limited to, exercising, writing, drawing, eating or even using the bathroom, all of which, is the literal definition of a disability under the ADA.

52.      Plaintiff has had to rely on other AICs whom were not always available to help him, and should not have had to help him, in carrying out many of his normal daily activities leaving him stranded without aide, ashamed and embarrassed causing further psychological harm.

53.      Even years later now, the plaintiff still cannot even do a normal push-up or exercise properly like he used to, let alone, draw, which used to be a huge passion of the Plaintiff's.

54.      Plaintiff cannot write more than a paragraph before his hand starts to hurt and cramp up to an unbearable state. Even the little that plaintiff can write, has suffered substantial artistic value as to the Plaintiff's prior handwriting ability only enhancing the Plaintiff's suffrage.

55.      Plaintiff does not even shake hands with his right hand anymore out of fear of someone squeezing to hard or twisting his wrist, which often happens when shaking hands with different people.

56.      Plaintiff cannot trust to hold anything of weight or importance with his right-dominant-hand as there is a high probability that he will drop it, which has happened to him on multiple occasions causing him to lose his trust and confidence in his abilities to do so.

57.      The pain in Plaintiff's right-dominant-hand, is constant. In fact, the plaintiff still wakes up sometimes in the middle of the night having to take Ibuprofen and Tylenol for any relief that he can get so that he can hope and try to go back to sleep.

58.      On June 06th, 2021, approx. 73 days after the breaking of Plaintiff's right-dominant-hand, plaintiff finally had a surgery performed by Dr. Carpenter at the Good Shepard Hospital in Hermiston, Oregon.

59.      Within a week after the surgery mentioned in section 57 above, Dr. Carpenter seen plaintiff again and told the plaintiff that he believed the surgery was a success and that plaintiff should be able to have a full recovery.

60.      On August 03rd, 2021, and after some, pushing and complaining about pain management and the fact that the Defendants, and each of them, were still not providing the plaintiff with anything beyond Ibuprofen and Tylenol, nor any physical therapy or rehabilitative treatment that plaintiff had been asking for, plaintiff was sent back out to see Dr. Carpenter again.

61.    During the visit mentioned in section 59 above, Dr. Carpenter informed the plaintiff that he "needed to see a physical therapist so that his hand does not get *froze* in place". However, that he "only does the surgery". Dr. Carpenter reiterated that he "does not have any control over pain medications/management or providing a physical therapist. That TRCI's Medical has full control over that and it is their decisions and responsibilities to either provide it to plaintiff or not". That he "does not get involved with that", paraphrasing. At this point, Dr. Carpenter determined that the cast could be removed and afforded the plaintiff a splint/brace for his right hand and told him that he needed to wear it for at least the next 30-60 days, which plaintiff complied[7].

62.    Dr. Carpenter also told the plaintiff that "without any further complications, he would not see him again for approx. another 18 months. At which point, he would evaluate whether or not the screw should be removed", paraphrasing. However, this has not happened either and Defendant Maney told the plaintiff that "they usually leave these things in permanently", while acknowledging that was only "his experience and not professional opinion". Yet, not corresponding with Dr. Carpenter on the matter either.

63.    Plaintiff believes that he has only had one visit to date with Defendant Maney concerning the recovery of his hand throughout this entire timeframe to this very day. At which point, Defendant Maney took another x-ray of Plaintiff's right hand and told him that "everything looked great and to do self-care". Again, this was either another lie, manipulation, etc. or the results of someone whom is not professionally educated in the specific fields of Orthopedic medicine and Hand Surgeries giving advice and medical treatment in the fields that they are not professionally educated in nor licensed.

64.    While Defendant Maney could not explain to the plaintiff why his hand was still hurting

---

[7] Ultimately, c/o Wheelan, a defendant in Plaintiff's other federal civil suit (Ross v. Blewett, et. al., Case No. 2:20-cv-01338-SB), confiscated it. Plaintiff tried to prevent this as it was given to him by Dr. Carpenter as personal property and the plaintiff still used it to help relieve his pain, this was to no avail as TRCI's medical (Defendants) "OK'd" the confiscation.

or why he was still experiencing sharp pains, he told the plaintiff that "you shouldn't have pain and if you do, you can take Ibuprofen and Tylenol for it".

65.     When plaintiff asked Defendant Maney if Dr. Carpenter had reviewed his x-ray, plaintiff was told "no". When plaintiff asked if any Orthopedic specialist has reviewed his x-ray, he was again told "no, that the *Radiologist* provide the results and that they are qualified to do so" and that they "go by the radiologists' reports". While acknowledging that these are the very same "Radiologist" that told plaintiff that his right-hand was not broken in the first place.

66.     Defendant Maney does not "specialize, nor is he professionally trained" in the field of Orthopedic Medicine or Hand Surgery.

67.     Defendant Maney was also not present at any of the Plaintiff's consultations with Dr. Carpenter.

68.     Defendant Maney is also not a fully licensed doctor. Rather, as far as the plaintiff can adduce, Defendant Maney is only an Acting General Nurse Practitioner.

69.     After all of the above, and during all of the above, plaintiff has written multiple times concerning the issues of his hand not healing right. Plaintiff has stated on multiple occasions that he believes that something is wrong and that he has developed some form of arthritis and/or carputunnel in his right hand. That he is still suffering from pain, has lost over 40% of the usage of his right hand, approx. 70% of strength in his right hand and 100% confidence in the usage of his right hand. That it hurts him to even carry his food tray or beverages, so he uses his left hand a lot. That he cannot even write a paragraph without suffering substantial pain and cramping in his right hand. Yet, despite all of this, plaintiff has either heard nothing back or the couple of nurses that have responded, simply give him some "generalized" response that has no meaning, nothing to do with actually receiving treatment and, ultimately, goes nowhere. Like the generalized response that "these things just take time to heal". A

response from someone not professionally educated in the field that they are assessing. Plaintiff just finds himself running in circles on the matter with no real help or treatment, which is truly the very definition of deliberate indifference.

70.    After the plaintiff filed his grievance as mentioned in section 28 above, plaintiff was able to obtain some of his medical records. While going through those medical records, plaintiff was able to uncover multiple documents that show that Defendants Blair and Maney had originally diagnosed him on 04-12-21, stating that everything is "*uniform*", "*remarkable*" and that he had "*no fractures*"[8]. And, that it was not until 04-13-21, that Dr. Carpenter reviewed the Plaintiff's x-ray acknowledging the fractures. After which, Dr. Carpenter informed "Tiffany that it is my belief that the patient should be told that there is a fracture and then his decision whether or not surgical procedure would be done Garofalo trying to handle it non-surgically definitely will talk to the patient providers involved".

71.    While the plaintiff is not sure who Garofalo is or what it means and is currently trying to figure this out, however, this all falls in line with the series of events that plaintiff has experienced in being called back down days later to TRCI Medical on May 14th, 2021, by Nurse Tiffany to be informed of such injury as just described above.

72.    To plaintiff, it appears that the State of Oregon's/ODOC's/TRCI's (Defendants) Medical operating through Defendants Blair and Maney, lied to him and were trying to cover it up in order to prevent the plaintiff from being sent out for surgery for nefarious reason(s), including retaliation for Plaintiff's prior grievances and lawsuits against them. Actions that were also reaffirmed by Defendants Roberts and Bugher's own actions in the matter as well as Dr. Carpenter's statements to the plaintiff that he "was told that plaintiff had refused the surgery" in response to Plaintiff's questioning as to why it had

---

[8] Hence, Plaintiff's reservations as to their qualifications or even the ethics of continuing to rely on their "expertise" to evaluate his injury, especially including Defendant Maney. Plaintiff believes that these things should be handled by a specialist, especially, since he is suing them, aka, conflict of interests.

taken so long to get him out for the surgery as mentioned in section 73 below.

73.    If not for Dr. Carpenter's intervention, and, as just described/explained above by Dr. Carpenter, no surgery would have led to "serious complications", including the "death of Plaintiff's navicular bones in his right-dominate-hand" altogether. And, because the Defendants were clearly not going to tell the plaintiff and were going to leave him to his own, "uninformed" devices and detriment, should constitute malicious deliberate indifference and negligence of the most extreme nature.

74.    It should also be noted, that when the plaintiff finally did have his first visit with Dr. Carpenter on May 18th, 2021, as identified above, plaintiff had asked Dr. Carpenter "why did it take so long to get me out to your office, because you had initially told me that you wanted me out here within the week for surgery?". Dr. Carpenter told the plaintiff that "I was told, that you had refused the surgery". In response to this, the plaintiff told Dr. Carpenter "that's ridiculous as I have been writing kytes every week and I even filed a grievance on it". Dr. Carpenter responded "I can only tell you what I have been told"[9]. Therefore, all of this is in line with the Defendants', and each of them', actions in trying to not afford the plaintiff the surgery. It also explains as to why the Defendants, and each of them, have continuously refused the plaintiff pain medications and any other form of relief or physical therapy throughout this entire ordeal and to this date. Clearly, they do not want to admit to nor give the plaintiff any evidence as to their unlawful and unconstitutional actions showing their heinous and malicious deliberate indifference and negligence in these matters.

75.    In September 2022, plaintiff was able to meet with Defendant Ventura, Statewide AIC ADA Coordinator for ODOC. The plaintiff just happened to run into Defendant Ventura in the hallway as she was doing a "pop-in" visit at TRCI.

76.    Defendant Ventura is the one whom made the ultimate decisions to deny the plaintiff any

---

[9] Transport officers were present during this colloquy and later verified such conversations through written communication, which will be provided to this court at a later time.

aide in response to his requests and grievances for some form of assistance or accommodations under the ADA like that of a NEO Alpha Smart Machine or an 11" Securebook to help him type general correspondence letters, legal and medical documents, etc., due to the disabilities of the Plaintiff's dominant and broken right hand, which had a cast on it for approx. 6 months.

77.    NEO devices and the 11" Securebooks are provided to several AICs at TRCI and throughout ODOC statewide through ADA services to aide AICs with disabilities.

78.    Federal courts have recognized that even temporary disabilities qualify under the ADA as a disability is *something that impairs a person's normal daily life, activities and abilities*. Not a time limit or calculation. More specifically, just because a disability may be temporary or "cured" at a later time, *does not* mitigate the immediate sufferance that it may cause in the present time.

79.    However, in Defendant Ventura's prior responses to the plaintiff and his filings and despite the plaintiff being in a cast and surgery, Defendant Ventura had stated that after "inquiring into your request with TRCI Health Services, your medical records determined that you do not have a hand disability warranting the need for aide".

80.    Therefore, when the plaintiff realized it was the same Defendant Ventura, plaintiff asked her if he could have a moment of her time. Defendant Ventura responded "yes, just a moment". So, after introductions of himself, his situation and her acknowledgment of it all and her responses to such, plaintiff showed Defendant Ventura his hand, the scaring from his surgery and the loss of movement and strength in his hand and the real need for a NEO device, Securebook or some other form of ADA acknowledgment and accommodations as it clearly affects his daily activities and abilities in everything that he does, especially, if he needs to write or meet a deadline in some issue, grievance or one of his legal cases. That he is in constant pain and that he takes daily doses of Ibuprofen and Tylenol in an attempt to alleviate his pain as medical will not give him anything else. That he believes that carputunnel

and/or arthritis may have set in, but that he cannot get any medical care or help on the matter.

81.    Defendant Ventura responded to the above stating "Yes, I can clearly see you have issues and that is why I do these *pop-in* visits as I cannot see for myself otherwise. So, when I am responding to a request or grievance like yours, I can only go off of what they (TRCI Medical/Defendants) are telling me as I am not here in person to see it for myself. It is unfortunate, but I will have them re-evaluate your situation and see what we can do to help you".

82.    Since the interaction with Defendant Ventura above, plaintiff has written multiple kytes (communication forms) to Defendants Maney (his care provider), Thompson (TRCI ADA Coordinator) and Wettlaufer (Nurse Manager) to no avail. They simply refuse that they have heard anything from Defendant Ventura and direct the plaintiff to continue taking Ibuprofen and Tylenol for pain and to do "self-care" again, stating without even seeing him in person or sending him back out to the Orthopedic specialist, Dr. Carpenter, or, to even see a physical therapy specialist to evaluate his hand and disability, that "these things just take time to heal".

83.    Plaintiff has not even been scheduled to be evaluated by TRCI's (Defendant's) own physical therapist whom frequents the institution, which the plaintiff has witnessed several other AICs receive such benefit, whom are all willing to testify to such.

84.    Plaintiff has even written Defendant Ventura again and she responded, "thanking plaintiff for his follow up with her and reassured him that she would have TRCI's medical and ADA Coordinator Kaycie Thompson (Defendants), re-examine and re-evaluate him and his medical treatment and any possible ADA needs and accommodations", paraphrasing.

85.    To this day, plaintiff still has not received such treatment and he does not want to keep writing them as they are known to retaliate against AICs for doing such. In fact, plaintiff has been retaliated against in the past for these very similar efforts, see *Ross v. Horton* (9th Cir. 2016) and, more

recently, has been, retaliated against by some of the same Defendants in his COVID-19 federal lawsuit,

*Ross v. Blewett*, Case No. 2:20-cv-01338-SB, preliminary injunction [73]. Not to mention, that this

honorable court has also granted a Temporary Restraining Order ("TRO") in this case as well [26]. So, it

is a fine line that the plaintiff has to navigate, but it is clear that he has tried to get the Defendants' help

and assistance and they have been deliberately indifferent to his medical needs, disabilities, ADA

accommodations, pain and suffering and overall safety and welfare.

86.    Plaintiff is also currently trying to assess the "full" extent of damage done to his bones,

cartilage, tendons, fibrosis tissues, etc., as he has still not been fully advised as to all of the details of the

surgery (did bones have to be re-broken to be properly re-aligned, damage done to tissues, tendons, etc.,

that had already begun to heal before the surgery, etc.) or any follow up analysis (loss of movement,

strength, arthritis, carputunnel, etc.) by any professional doctor trained in their respective fields, which

plaintiff intends to obtain through expert witnesses and present at trial.

87.    Due to the Defendants', and each of them', own deliberate indifference, the plaintiff has

not been able to have his injury evaluated by any professional doctor trained in the field of Orthopedics

or Physical Therapy since his last visit with Dr. Carpenter on August 03rd, 2021.

88.    Despite Plaintiff's repeated request for help in rehabilitation, physical therapy, pain

management, to see Dr. Carpenter again and for ADA assistance and/or accommodations, the plaintiff

has been refused, ignored and told to simply "work on it himself".

89.    Plaintiff has never been instructed nor given any paperwork for physical therapy of how

to "work-it-out" himself or what is right or wrong.

90.    Plaintiff has tried to do "self-care", however, he is constantly in fear of permanently

damaging something as he is sure the Defendants will try to shift the blame to him saying "it's your

fault, you should not have done this or that" despite their failure to assist, aide and inform him of such.

91.    Every time the plaintiff tries to stretch his right hand for "self-care", it becomes inflamed with pain and feels like someone is cutting his wrist with a razor blade. It is a very sharp sensation, which all of this has only led to the plaintiff suffering even more mental and physical strain and pain.

92.    To this day, the plaintiff still suffers from substantial amounts of severe pain and "cramping" in his right-dominate-hand, especially when he tries to write for any amount of time.

93.    Plaintiff has been left to his own devices without any guidance or assistance, while several other AICs throughout TRCI and ODOC receive such rehab, physical therapy and follow-up care, which plaintiff fully intends to prove at trial.

94.    All of the above has triggered the Plaintiff's depression to come back even worse than before, causing him further suffering, fear and psychological harm as a result of all of this. Ultimately, plaintiff has had to go back on medications for his mental health as a result of all of this.

95.    The Defendants do have a substantial and overwhelming history and pattern in resulting in millions upon millions of dollars in lawsuits related to their very same actions, failures, maliciousness, deliberate indifference and outright heinous negligence as the Plaintiff has suffered from as described above and throughout this case.

96.    All of the above has substantially *limited* and *handicapped* the Plaintiff's *abilities* to participate in other daily and recreational activities as well causing him to lose enjoyment in my life (basically, any activity or recreation that involves the usage of his right-dominate-hand, like basketball playing video games, drawing or even trying to write a letter).

97.    As for permanent damage, the plaintiff has lost at least. 40% or more of any movement, strength, function and usage of his right hand.

98.    Plaintiff suffers daily from pain and it is more likely than not, that arthritis and/or carputunnel has set in.

99.    Since the filing of the Original Complaint, on May 30, 2023, Plaintiff was seen by Dr. Vitt at TRCI Medical.

100.    Dr. Vitt told Plaintiff that he had been requested to evaluate the injury and recovery of his right hand, which appear to be in response as to the original filing of this lawsuit as it came out of nowhere and after years of refusing to see or treat the plaintiff. However, plaintiff complied out of his desire of wanting and needing help with his injury.

101.    Dr. Vitt evaluated Plaintiff's injury and told him that he needed, in the very least, physical therapy. That he would be putting in a request with the TLC committee for it. That he also wanted another x-ray of the Plaintiff's right hand and that he would most likely be sending plaintiff back out to see Dr. Carpenter again. However, Dr. Vitt stated that he wanted to get the x-ray first before requesting to send the plaintiff back out to Dr. Carpenter. That in the interim, he would request the physical therapy though the TLC committee.

102.    During the above-mentioned visit Dr. Vitt, Dr. Vitt performed several tests and exercises on Plaintiff's right hand and told him that he would most likely not have the full function of his right hand again.

103.    Dr. Vitt also asked plaintiff what he used to do for work in prison and before he came to prison and he told the plaintiff that he would probably have to find a new line of work due to his injury.

104.    Approx. a week later after this visit on June 06, 2023, plaintiff was called back down to TRCI's Medical and given an x-ray of the injured area on his right hand per Dr. Vit's request.

105.    The above-mentioned x-ray was performed by Mrs. Davis, Radiologist.

106.    Mrs. Davis[10], told plaintiff that "I am not an orthopedic surgeon by no means, however, I have been doing this for a very long time. And, in my professional opinion, your hand has not healed at

---

[10] Noting that the Defendants have already stated in written form to the plaintiff, that they rely on their radiologists' opinions as *qualified* opinions.

all. In fact, I think that if it were not for the screw in your hand, it would all fall apart". That "you have no calcium build up over the injury, nothing!". That, "you need to see Dr. Carpenter again and if I was you, I would not let this go. If you do not hear something back from medical in the next week or so, you should be flooding them with kytes". That "to her, she can see why the plaintiff is still having pain and complications, because his injury is not healing properly".

107.    Since the x-ray and interaction with Ms. Davis as mentioned above, plaintiff has been informed by TRCI medical that Dr, Vitt is "no longer with ODOC" and that his "issues will be forwarded to his care provider, Defendant Maney".

108.    Defendant Maney has since told the plaintiff that "nothing is wrong".

109.    Plaintiff is still currently "battling" all of this through the "paper" system as well and as noted above, and the recent filing in connection with this Court's granting of a TRO [26] in this case, the defendants, and each of them, have retaliated against the plaintiff and have subjected him to further pain, suffering and irreparable harm by forcing him to work with deliberate indifference and callous disregard for his serious medical needs concerning the injury to his right dominant hand and its disabilities.

110.    It is also more likely than not, that plaintiff does have permanent and unrepairable damage due to the deliberate indifference and negligence that he has suffered and endured by the actions, failures and/or negligence of the Defendants, and each of them, throughout this entire incident.

111.    The Defendants, and each of them, acted with callous disregard for the rights, serious medical needs, and physical safety and overall wellbeing of the plaintiff. For all of the reasons above, plaintiff is entitled to damages against the Defendants, and each of them, for pain and suffering and harms and losses resulting from their actions and/or failures as outlined throughout this complaint.

112.    Plaintiff is further entitled to an award of punitive damages in an amount to be proven at trial.

113.    The Eighth Amendment to the U.S. Constitution, as incorporated against States through the Fourteenth Amendment, guarantees that prisoners may not be subjected to cruel and unusual punishment by State actors. Specifically, prisoners in state custody have a right to proper and timely medical treatment. Defendants, and each of them, were deliberately indifferent to the rights of plaintiff, and for all of the reasons above, the Defendants, and each of them, therefore acted in violation of the Eighth Amendment.

114.    Plaintiff has suffered harm as a result of Defendants' negligence, including pain, suffering, disability, and permanent injury resulting in economic and non-economic damages in amounts to be proven at trial.

Retaliation:

115.    Defendants made-up a *non-existent* and *non-official* rule with the nefarious, malicious, retaliatory and sole intent to interfere with Plaintiff's access to their law libraries by limiting said access to a 0 to 3 call-outs/sessions per week maximum regardless of availability of space, computers or other resources. On several occasions, this "rule" was stated and used to prevent and outright deny the plaintiff access to the Defendants' law libraries[11] and despite Defendants' sworn assurances to the contrary, has continued at the time of the filing of this First Amended Complaint.

116.    Legal work done and prepared in the Defendants' law libraries, is stored on a digital thumb drive device ("TD"), which such devices are provided to all AICs throughout ODOC's 14 prisons/facilities/institutions whom are actively working on legal matters/cases.

117.    The TDs provided to ODOC's AIC population, including the plaintiff, as described in section 116 above, are stored and secured in the Defendants' law libraries and are not allowed to be

---

[11] See Declarations of Amy Wray, Law Library Services Manager for ODOC, Decl. ¶ 7 and 9, [93] and Supplemental Decl. ¶ 5-7, [99] in the case of Ross v. Blewett, et. al., Case No. 2:20-cv-01338-SB, acknowledging such.

removed or taken from the Defendants' law libraries, see footnote 11.

118.    In order for ODOC's AIC population, including the plaintiff, whom are provided said TDs, to access and/or complete/save additional legal work on the documents stored and saved on these devices, AICs must sign-up for and be allowed to attend, law library sessions/call-outs.

119.    The digital age is finally starting to be integrated into the prison industry. In fact, even Federal District Courts, including this Court, now mandates that all legal filings be filed via digital service (e-mail/fax) regardless of incarceration status.

120.    ODOC as a whole, has largely tried to prevent this advancement of technology throughout its prisons/facilities/institutions. A lot of the reasoning behind this is in order to prevent its AIC population, including the plaintiff, from having the abilities to become more organized in their efforts to seek redress in the courts whether it be criminal or civil. As well as to limit their AIC population, including the plaintiff, from having a voice, especially, in the "outside" world.

121.    This includes technology that is widely and vastly implemented throughout prisons in at least 28 other States throughout the United States of America, including prisons that would make any ODOC prison/facility/institution look like a day care camp in terms of violence, safety and security concerns, is exclusively prohibited in any ODOC prison/facility/institution.

122.    When plaintiff explained to Defendant Reyes his hardships with gaining access to the Institution's law libraries to gain access to and work on his legal documents stored in the Institution's law libraries, and, raised the topic of being provided an 11" Securebook for his disability (hand injury), Defendant Reyes told the plaintiff "why would I want to give you one of those? So, you can sue me better? In fact, my office is currently trying to get them removed from the institution. We do not want them in here".

123.    Over the last 20 years of Plaintiff's incarceration in ODOC, plaintiff has filed many

lawsuits. Some of which, plaintiff was successful in and some of which, he was not. Albeit, plaintiff would contend that he only ever lost a case due to his insufficiencies as an attorney, lack of resources, and more blatantly, the refusal of courts to appoint him representation while he was up against the State's slue of the highest level of professionally trained and experienced attorneys.

124.    Plaintiff does currently have multiple active lawsuits against some of the very same Defendants in this case for varying reasons, including, but not limited to, unlawful trust account withdrawals, COVID-19 issues and inadequate dental treatment.

125.    On August 04, 2023, plaintiff was called down to TRCI's medical, where he was confronted by Jane Doe[12] at the behest of Defendant Bugher. Jane Doe informed plaintiff that Defendant Bugher wanted to know if plaintiff would be ok with transferring to the Oregon State Penitentiary ("OSP") to have his partial denture made. Apparently, this was to be in response to Plaintiff's First Level Grievance Appeal on the matter.

126.    Plaintiff specifically stated to Jane Doe, that "no, I cannot go to OSP or any other prison, because of my security concerns". That "I am at this prison (TRCI) for a reason". That "I am a victim under the Prison Rape Elimination Act ("PREA") and a drop-out gang member of one of this State's most notorious prison gangs". Jane Doe responded "SO, you would not be OK with going to OSP?". And, plaintiff responded "NO, did you not just here me?". And, Jane Doe responded "Yeah, we know about your conflict, but this is what "they" are offering". And, plaintiff responded "Well, if that is the treatment that you are offering, then, I do not want it. Just asking me this is traumatizing. Why would they even come at me like that? Why are you making me re-live all of this and trying to put me in fear?

---

[12] There are some confusions as to whom this person is. Plaintiff originally thought that she was a dental assistant, then, some information came to light that she was known as one G. Shock. However, there is now more information that Mrs. Doe is someone else entirely. Therefore, and in order to not delay any further the filing of this complaint, plaintiff is simply referring to this person as Jane Doe. Plaintiff is still trying to find out the real identity of this person, however, at this point, plaintiff believes the exact identity to be of little relevance as this person is not a named-defendant at this point and this interaction and its communication/details have not been contested at any point throughout the Administrative process in any way, shape, form or manner.

Why can't the denturist here just fix the problem? He has made this very same partial for me multiple times over the last ten (10) years". Jane Doe responded that "the denturist is not going to do that, all I know is that this is what they are offering you". Plaintiff responded "So, instead of just admitting that he made a mistake, which is obvious, and correcting it. Put me in harm' way? If that is the treatment that you are going to give me, then, just leave me alone. I will figure something else out". Jane Doe responded "OK, I will let them know" and the plaintiff then returned back to his housing unit[13].

127.    At approx. 5am on August 09, 2023, plaintiff was awoken by his housing unit officer with a handful of bags telling him that he was being transported to another ODOC prison/facility/institution.

128.    Before and leading up to the transport, plaintiff repeatedly tried to communicate with his housing officers Wheelan and Surber addressing his security concerns, why he was transported to TRCI in the first place and why he should not be transported now.

129.    More specifically, in 2013 while incarcerated at the Eastern Oregon Correctional Institution ("EOCI"), the plaintiff was sexually and physically assaulted by a high-ranking gang member from one of Oregon's most notorious prison gangs. As a result, the plaintiff was transferred to TRCI for his physical safety and overall wellbeing.

130.    Correctional Officer ("C/O") Surber refused to allow the plaintiff to speak to anyone of higher command. Instead, C/O Surber told the plaintiff that he could "talk to the transport officers and the R&D Sergeant once you get down there".

131.    Even Plaintiff's other housing officer, C/O Wheelan[14], whom is aware of Plaintiff's security issue, refused to be of assistance.

---

[13] Albeit, the dental issues are being litigated separately from this case, nevertheless, it does involve some of the very same Defendants as this case does and the plaintiff believes that the Defendants used this as an opportunity to interfere, chill and retaliate against him for all of his legal filings, including this very case at hand.

[14] Acknowledging that C/O Wheelan is also a Defendant in Plaintiff's other civil complaint Ross v. Blewett, et. al., Case No. 2:20-cv-01338-SB, for her involvement in interfering with Plaintiff's access to the Defendants' law libraries. As well as the C/O whom confiscated Plaintiff's wrist brace that was provided to him as personal property by Dr. Carpenter.

132.    When the plaintiff arrived in R&D at approx. 9:30am, he tried speaking to both, the R&D Sergeant and the Transport officer Ige, informing them both of his security concerns and why he cannot go to OSP as described above. They both told the plaintiff that "this is way above our heads". That "the ones-in-charge know your security concerns and clearly thought it was not an issue". That "there is nothing we or you can do. If you try to refuse, you will be physically restrained and forced to go anyways. We will put you in the restraints chair and trust us, you do not want to go on transport stuck in a restraints chair for hours man, it's terrible. Either way though, you are going".

133.    Thus, plaintiff felt that he had no other option, but to comply and so he did. The last thing that plaintiff wanted to do, was give the Defendants something that they could try to use as "justifiable cause" for their retaliation and egregious actions with deliberate indifference towards his safety, security and overall wellbeing in these regards.

134.    Almost immediately after the plaintiff arrived at OSP, his security concerns were recognized by one Sgt. Brown. Sgt. Brown told the plaintiff that "Mr. Ross, you cannot be here. What the hell were they thinking by sending you here?". And, the plaintiff responded to Sgt. Brown stating that "they are retaliating against me".

135.    Sgt. Brown immediately put the plaintiff in contact with OSP's PREA Coordinator Anna P. and his prison counselor at OSP, Mr. Booher, whom were both just as shocked as Sgt. Brown and the plaintiff were.

136.    Immediately upon hearing this, Plaintiff's family also contacted Oregon's Statewide PREA Coordinator whom looked into it and expressed the very same concerns and shock.

137.    Every prison official and PREA coordinator at OSP and at the Statewide office, told the plaintiff and his family members the same thing, that "this should not have happened", that "not one person in charge of Plaintiff's safety and security at TRCI took any action to prevent this transfer from

happening", that "even Plaintiff's own counselor at TRCI, K. Wright, refused to get involved", and, that "while medical can make prison transfers for medical reasons, with Plaintiff's security concerns at stake and the fact that *it was not a medical emergency*, the transfer could have and should have been stopped immediately". That "even the R&D Sergeant and Transport Officers could have stopped it as soon as the plaintiff made them aware of his safety and security concerns and the fact that it was a non-emergency transfer and that there were several hours, if not, days, depending on what time-frame you go by[15], in-between the time plaintiff was notified of the transport and the actual transport taking place".

138.    While also acknowledging that the above was supposed to be an "offer" as to a "suggested" resolution to the filing of Plaintiff's grievances over the matter. An offer as to which the plaintiff outrightly refused the prior week. More specifically, when does it ever happen or, when is it ever appropriate in a litigative proceeding, for an opposing party to just give a plaintiff any form of relief to resolve a litigative proceeding, without first checking to see if the plaintiff would accept such offer, resolution, pay-out, etc.? The answer is that it never happens unless the Defendants had an ulterior motive, which in this case, was retaliation. The Defendants seen an opportunity to transport the Defendant out of the facility, hopefully, permanently, due to his grievances and lawsuits against them, and, they took it.

139.    Fortunately, OSP prison officials, counselors and PREA Coordinators were able to help get the plaintiff transported back to TRCI within 8 days through a special transport as Plaintiff's safety and security was "their" main concern. And, when the plaintiff tried to thank them all for helping him, they all had the same response "we are just doing our jobs, unlike those other people involved who clearly were not, which seems to be their thing out east". Suggesting that there is a pattern with this kind of conduct that plaintiff fully intends to prove at trial.

---

[15] The day that plaintiff specifically told Jane Doe to not transport him or the timeframe of which the plaintiff tried speaking to his housing officers, R&D Sergeant and the actual Transport Officer Ige.

140.    The Defendants had taken prior actions to transport the plaintiff out of TRCI in one of his prior federal civil complaints[16]. However, in that case, the plaintiff was represented by Christopher F. McCracken whom was able to get the assistant attorney general, Shannon M. Vincent, involved to stop the transfer and retaliation at that time.

141.    ODOC Policy as well as the Plaintiff's Constitutional Rights, do not allow forced medical treatment for non-emergency treatments.

142.    It is clear that ODOC has created a separation of Operations, Securities and Enforcements splitting prisons and correctional facilities in half commonly referred to as the Eastside and Westside of Operations in the State of Oregon.

143.    Plaintiff was informed that there was an attempt made by the Defendants to prevent him from being transferred back to TRCI, which would further prove that this was indeed a retaliatory transfer. Especially, since the reasoning behind this effort, had never been a problem in the past. If nothing else, it was self-created by the Defendants in the first place and was never once brought up as an issue to plaintiff in over the last 10 years since plaintiff was originally transported to TRCI back in 2013 for his safety and security in the first place.

144.    Plaintiff never did receive any dental treatment while at OSP and still has not at the time of the filing of this First Amended Complaint.

145.    TRCI's design, operations and separation of its AIC population, render it the safest prison in the State of Oregon. Hence, why the plaintiff was sent to TRCI in the first place.

146.    Upon the Plaintiff's arrival back at TRCI, he was not placed back on his original housing unit nor given his job back as an assistant aide, while acknowledging that plaintiff was originally assigned the light-duty work detail, because of his hand injury. As stated previously, the plaintiff original

---

[16] *Ross v. Hodney*, et. al., Case No. 2:18-cv-01441-YY.

job for over 5 years before the breaking and disabilities associated with the breakage of his right-dominate-hand, was in OCE laundry. A highly respected and one of the highest paid work assignments in all of ODOC.

147.    Out of fear of being placed into work detail that would cause hm additional pain, suffering and threaten his overall security and welfare, Plaintiff tried applying and explaining all of this to D. Hunter, IWP Coordinator (Work Assignments)[17], for his old job back as well as several other jobs that might not subject him to such irreparable harm.

148.    D. Hunter, IWP Coordinator (Work Assignments), instead, assigned plaintiff to work in TRCI's kitchen.

149.    TRCI's kitchen is one of the most unsought after work details in prison for several factors. A lot of these factors include long work hours with the worst work-to-work-hours-to-pay than any other work detail in the prison. However, the number-one reason is due to the fact that the kitchen is one of the only work assignments in TRCI that does not require clear conduct or good behavior and, as such, an overwhelming majority of AICs whom are forced to work in the kitchen, usually have no clear conduct, are active gang members and are fresh out of disciplinary confinement. Thus, for someone whom might have several years of clear conduct, living on privileged housing and trying to stay out of trouble, let alone, have underlying security concerns such as being a drop-out gang member and PREA victim, as is the plaintiff, might not want to be forced into working in this environment. Especially since, all of these factors are considered predatory factors for active gang members, which are usually the ones forced to work in the kitchen as they do not have any clear conduct to work in any other work detail. Not to mention that the first thing that these "trouble makers" do when forced to work in the kitchen, is assault, extort and abuse AICs like the plaintiff whom are just trying to stay out of trouble.

---

[17] D. Hunter is also a Defendant in Plaintiff's other §1983 lawsuit, Ross v. Blewett, Case No. 2:20-cv-01338-SB, for her participation in actively interfering with Plaintiff's access to the courts under the guise of work assignment interference.

150.    A large portion of assaults and disciplinary action that occurs in TRCI, let alone, ODOC as a whole, occurs in its kitchen.

151.    TRCI's kitchen is not only the most unsafe work environment for plaintiff to work in due to his security concerns alone, it also requires the usage of one's dominate hand, which, in Plaintiff's case, would only cause him further pain, suffering and irreparable harm.

152.    On the night of 09-27-23 at approx. 9:45pm, while plaintiff was checking his call-outs for the next day to see if he was on the call-out for the law library, plaintiff noticed that he was on a call-out for a 3:30am kitchen job. Plaintiff did not apply for this job, nor did was plaintiff previously informed of this or even given a chance to prepare himself to wake up at such an early time[18].

153.    On the morning of 09-28-23 at 3:30am, Plaintiff's housing officer had to wake him up due to Plaintiff's medicated status as described in footnote 17.

154.    On the morning of 09-28-23 at 3:45am, when Plaintiff reported to the kitchen coordinator, he immediately informed the kitchen coordinator of his security concerns and medical issues with his right-dominate-hand. In response to this, she asked Corporal Ternes for assistance after which, the plaintiff had to re-explain everything to him. Corporal Ternes told the plaintiff to return to his housing unit and to kyte medical and his Behavioral Health Services ("BHS") counselor about these issues. That he would also contact medical and Plaintiff's BHS counselor and if they said that plaintiff had to work, then, he would have to work or go to the hole.

155.    Plaintiff wrote several kytes explaining all of these issues as described above and throughout this complaint, to BHS, Medical, Operations Captain Archer, Asst. Supt. of Security Captain Rumsey, PREA Coordinator Captain Herron, Work Coordinator D. Hunter, Care Provider Maney and

---

[18] Plaintiff suffers from insomnia and other COVID-19 long haulers' disabilities that substantially effect his ability to have a normal sleep schedule, let alone, sleep at all. As such, plaintiff takes medication to force him to sleep, which requires the plaintiff to get at least 7-8 hours of sleep in order to function and for the medication to wear off.

personally spoke with his housing C/Os Mrs. Munoz, C/O Blakely and C/O Pollard as well as C/O

Navarro (also a PREA associate) all to no avail. In fact, most of them specifically refused to speak to the

plaintiff, with Captain Herron specifically stating that "unless the plaintiff is raped again, I have nothing

to say to him".

156.    On 09-29-23 at approx. 3:30am and having received no help from all of the above

mentioned, plaintiff had to show up again for work detail in the kitchen. Upon arrival, plaintiff spotted

Sgt. Ternes and immediately walked up to him and asked him if he had heard anything or gotten

anywhere.

157.    Sgt. Ternes told the plaintiff to again, kyte BHS and that he would also be sending them

another email to see plaintiff. However, he could not find anything on the matters or concerns addressed

by the plaintiff, nor was there anything in Plaintiff's medical file either.

158.    Sgt. Ternes tole the plaintiff that if Medical and BHS refuse to help him, that he would be

forced to work or he would be placed into solitary confinement, losing his 10 years of clear conduct,

good behavior and privileged housing.

159.    On 09-29-23 at approx. 10 am, Plaintiff was called down to BHS and seen by other

individuals as Plaintiff's specific BHS Counselor was not available. These other individuals told plaintiff

that all of his issues are security related and have nothing to do with his mental health. When plaintiff

asked them if they were saying that being sexually assaulted and then forced into a position that will

threaten his safety while incarcerated and cause him substantial pain and suffering due to his hand

injury, has nothing to do with his overall mental health, they refused to answer the question. Plaintiff

told them "that is because you guys are not trying to help me, you are trying to hurt me and to interfere

in my legal cases. Because if I lose all of my conduct and go to the hole, that is what you guys want as it

would give you further justification to interfere and retaliate against me".

160.    Additionally, plaintiff asked both, Sgt. Ternes and the BHS counselors to send him to medical for an emergency evaluation if they would not help him in these matters and they all refused to do so. They all said that plaintiff had to write a kyte, which would take a week or longer to get a response to while not addressing Plaintiff's immediate issues and concerns. Instead, plaintiff would be forced through threats of disciplinary punishment and solitary confinement to endure substantial physical pain, suffering and to put himself into harm' way of potential physical assault, irreparable harm and/or death.

161.    On 10-02-23, plaintiff received approx. 6 of his kytes back all stapled together, stating "see the response from the attached communication", with that ultimate response being "we discussed this the other day". Referring to BHS's statements that they could not help the plaintiff in these matters.

162.    It should be acknowledged that Plaintiff's prior BHS Counselors have intervened in the past to prevent the plaintiff from working in the kitchen.

163.    It should also be noted that there are literally hundreds of AICs at TRCI whom do not have all of the security, medical and mental health issues that the plaintiff does, and, yet, they are not forced to go to work at all.

164.    It should also be acknowledged that there have been substantial periods of time over the last 20 years of Plaintiff's incarceration throughout ODOC's facilities, that plaintiff has went without having any job at all. So, the Defendants did not have to force the plaintiff, specifically, into working in this specific position in the kitchen at this specific time.

165.    At the time of the filing of this First Amended Complaint, Plaintiff has been denied approx. 6 work assignments that he has applied for despite their availability and their coordinators attempt to the plaintiff. These were all work details that the plaintiff believes that he could have performed without causing any further injury to his right-dominate-hand, including, his old job back as

an Asst Aide (wheelchair pusher).

166.    At the time of the filing of this FAC, all of these work assignments were still available.

167.    All of the above, are ongoing issues.

Pre-Existing Medical Conditions:

168.    Plaintiff does have pre-existing medical conditions that have been complicated due to all of the above. At minimum, plaintiff suffers from PVCs (Premature Ventricular Contractions). It is when the heart pumps without being filled with blood. If you hit a high enough number of these PVCs within a minute, you will go into cardiac arrest.

169.    Plaintiff's PVC's get really bad when he is subjected to higher levels of stress and/or when the plaintiff is not in good health/overweight, which all of the above has caused him harm in all of these regards.

170.    Plaintiff is extremely stressed-out due to all of the above and has gained approx. 30+ pounds in weight due to all of this, including losing his job in OCE Laundry due to the extreme delay and recovery of his injury. As well as his inabilities to write anything without having to have some other prisoner do it for him, which has violated his HIPPA rights. Not to mention, substantially limiting what the plaintiff could say and what he could do, because no one would provide him with any ADA devices or accommodations to alleviate his disabilities, and, thus leaving plaintiff no "viable" alternative options and causing him undue harm and stress. While not forgetting that the plaintiff has been retaliated against in multiple forms and ways through transferring him to other prisons across the State of Oregon, to forcing the plaintiff to work in conditions detrimental to his overall health and safety, potentially causing plaintiff irreparable harm and psychological harm.

171.    The plaintiff's family history has a long line of people dying due to heart failures in one

regard or another. The Plaintiff's great grandfather died of a heart attack, his grandfather has had 5 heart attacks and his father just died recently from a heart attack. So, heart problems run in his family.

172.    The plaintiff also has something wrong in his digestive system that he is struggling with and taking meds for, which may have something to do with all of the Ibuprofen and Tylenol that the plaintiff has had to rely on for pain management throughout this entire issue.

173.    Plaintiff has also sustained a terrible head injury and is suffering from that as well. The metal plates in his face surrounding his orbital socket have been causing him pain and discomfort and effecting his breathing through his nasal passage.

174.    Plaintiff is also suffering from Fatty Liver disease and all of the complications that have been caused upon his person due to being infected with COVID-19, which includes loss of muscle mass in his left lung, loss of smell and taste, brain fog, migraines, loss of energy and extreme depression just to name a few. Any recovery from this has also been substantially affected due to his injury, disabilities and pain that he suffers from the injury done to his right hand and the Defendants', and each of them', actions, failures, deliberate indifference and negligence as described above and throughout this complaint.

## INJURIES

175.    Plaintiff realleges and incorporates paragraphs 1 through 174 as if fully set forth herein.

176.    Plaintiff's right hand was broken in two different places, which after a substantially and unjustified delay of approx. 10+ weeks later (over 70+ days), plaintiff finally received a surgery to re-align the Navicular bones in his right hand.

177.    Plaintiff had a metal screw installed which may or may not ever be removed. Plaintiff does not know, because he was told by Dr. Carpenter that he would "re-evaluate him in approx. 18

months to determine whether or not to leave the screw in or have it removed", which has not happened.

178.    Any time the plaintiff has tried to communicate with the Defendant's Medical or the Defendant's ODOC/TRCI AIC ADA Coordinators Defendants Ventura or Thompson, for help or accommodations on the matter, he is either told to recover himself or he is simply ignored and his responses are not responded to at all.

179.    As described above, in September 2022, plaintiff was able to meet with Defendant Ventura, Statewide AIC ADA Coordinator for ODOC. Unfortunately, as described above, nothing has come of this to date. Plaintiff has received no accommodations for his injury/disability, which has caused him additional pain, suffering, psychological trauma and irreparable harm as a result.

180.    Plaintiff still has loss of over 40% of overall usage of his right hand. He continues to suffer from pain related to the injury and deliberate indifference, medical neglect and outright negligence by the Defendants, and each of them, in regards to the injury, recovery, and physical rehabilitation of his right hand.

181.    Plaintiff has not been given any ADA accommodations or leniencies as everyone just declares him to not have anything wrong based on their own "unofficial" and "unprofessioned" opinions on matters that they are not specifically, nor professionally trained nor licensed in the fields of Orthopedic Medicine or Physical Therapy to give.

182.    Plaintiff does believe that arthritis and/or carputunnel has set in as a result of all of this and he also believes that the loss of movement and usage in his right hand is permanent.

183.    Plaintiff has lost his job working in OCE Laundry at TRCI, a position that he held for over 5+ years, as a result of all of this. This position and employment paid twice as much as any other prison job at TRCI. Thus, this has substantially affected plaintiff financially as well[19].

---

[19] Oregon's Congress and Oregon's Voters Enacted BM 112 Amending Oregon's Constitution to end Prison Slavery and Involuntary Servitude. Coupled with the doctrine of "inherent intent", this now affords Oregon's prisoners rights associated

184.    Plaintiff cannot do work that requires strain on his right hand due to all of this and the disabilities that he now suffers from.

185.    Plaintiff was forced with the threat of disciplinary punishment and solitary confinement to work in an environment detrimental to his overall welfare, potentially, if not, causing him irreparable harm to his injury and recovery of his right-dominate-hand.

186.    Plaintiff is also being discriminated and/or retaliated against due to his injury, this lawsuit and the TRO [26] issued in this case, by the Defendants in not allowing him to have any job whatsoever now, substantially effecting Plaintiff's financial stability and further causing him irreparable harm and psychological trauma as a result. Especially, since the Defendants had been forcing the plaintiff to work for over the last (2) two years of his injury. Therefore, Defendants were either wrong in the last 2+ years of forcing the plaintiff to work or, Defendants are maliciously, discriminatorily and retaliatorily overreacting now in response to Plaintiff's grant of the TRO [26] in this case.

187.    Defendants have denied the plaintiff many of the jobs that he has applied for due to this lawsuit and the TRO [26] issued in this case, which as stated in section 133 above, is due to malicious, discriminatory and retaliatory purposes.

188.    Plaintiff should have been sent out "within the week" of his injury for the surgery to be performed like Dr. Carpenter had originally requested.

189.    Allowing Plaintiff's injury to heal for approx. 73+ days before performing a surgery, is directly connected to the complications and disabilities that plaintiff now suffers from today and as described above and throughout this complaint.

190.    All of the above has caused permanent damages to the healing process and fibrosis tissues that had to be reinjured to perform the surgery well after the healing process had already begun resulting

---

with prison work.

in further injury that the plaintiff now suffers from.

191.    If the surgery would have been performed in the original timeframe of "within the week" or very shortly thereafter, this would have eliminated or substantially reduced the chance of such damages and amount of pain, suffering and psychological trauma that the plaintiff has had to endure throughout all of this and continuing to this day. Especially, without being provided a sufficient pain medication or any accommodations to cope with his pain and disabilities, that he has suffered and continues to suffer from.

192.    Being provided a timely surgery and physical therapy, plaintiff would not be suffering from the disabilities and complications that he is now suffering from to this very day that causes him substantial pain, suffering and psychological trauma, while also substantially hindering and limiting his daily activities and enjoyment of life, as well as his abilities to get a better paying job, like his old job back in OCE or to be able to participate in daily and recreational activities like he used to, and, plaintiff would have had a full recovery as Dr. Carpenter had originally diagnosed and envisioned.

193.    Plaintiff should have also been afforded weekly physical therapy from a specialist[20] and, in the very least, he should have been consulted by a qualified physical therapist to ensure his chances for a full recovery and to prevent any permanent damage or disabilities.

194.    Plaintiff should have been and still should be, afforded ADA accommodations as described above and throughout this complaint.

195.    Accommodations like a NEO Alpha Smart Machine, 11" Securebook (Laptop) and additional time allotted to plaintiff to meet any timeframes and deadlines as described above and throughout this complaint, would have and still would, substantially reduce much of the pain, suffering and psychological trauma that plaintiff has had to endure and continues to endure to this very day.

---

[20] Again, acknowledging that Defendants do have an "in-house" Physical Therapy Specialist whom does provide his services to TRCI and its AIC population, except, in this case, the plaintiff.

196.    Plaintiff should have also been afforded a "long-term" prescription of Tramadol or other

significant pain medication alternative other than Ibuprofen and Tylenol, from the very moment that his

right-dominate-hand was confirmed broken, up to the surgery and for a reasonable amount of time after

the surgery. This would have substantially limited or eliminated altogether, the pain, suffering and

psychological trauma from Plaintiff's dominate-right-hand being broken that he had to endure for

months leading up to the day of surgery and beyond.

197.    In fact, plaintiff should still be afforded some form of NSAID that is less hazardous to his

organs and stomach than being left to take Ibuprofen and Tylenol indefinitely as his injury is still

persisting and he is still suffering from pain and psychological trauma due to the injury to his right-

dominate-hand and the Defendants', and each of them', actions, failures, maliciousness, deliberate

indifference and outright heinous negligence in these matters as described above and throughout this

complaint, including their continued failures/refusals to provide the plaintiff with any accommodations

as described above and throughout this complaint.

198.    Defendants' made-up, non-existent and non-official "0 to 3 call-outs/sessions per week to

attend its law libraries and thus, Plaintiff's abilities to access his legal work, documents, etc. stored on a

digital device permanently held in its law libraries as described above and throughout this complaint, has

caused the plaintiff to miss deadlines resulting in the missed opportunity to an appellate process in his

Daughter's case[21] and has required multiple extensions of time in all of his legal cases, matters, etc.,

including this case at hand.

199.    Defendants' unwanted, unnecessary and retaliatory prison transfer of plaintiff to its most

unsafe and only penitentiary (OSP) in the State of Oregon, caused plaintiff psychological trauma and put

him in constant fear for his overall wellbeing and life, which plaintiff suffered from for 8 days while

---

[21] J.R. v. North Dakota, Case No. 22-5272.

OSP prison and PREA officials scrambled to get plaintiff transferred back to TRCI.

200.    Part of the suffering that plaintiff endured as mentioned in section 146 above, but not limited to, included restless nights of pacing back and forth in his cell, extreme anxiety, substantial fear for his life, including having to be re-traumatized with all of the facts of the sexual assault that plaintiff suffered from back in 2013 and financial loss. This also includes the upheaval of all of Plaintiff's personal property, including his legal work, which was mixed together with approx. 5-7 other legal cases/matters that the plaintiff is working on and all of the issues, complications and hindrances associated with that. As well as the loss, shock and awe of any confidences that the plaintiff had in ODOC prison officials (aka Defendants) to keep him safe as they are the ones committing these crimes against him. After all, plaintiff should not have to be in fear of ODOC officials whom are obligated as a matter of law, to keep him safe.

## CAUSES OF ACTION

### Claim 1
### Violation of Eighth Amendment
### (42 U.S.C. § 1983)

#### Plaintiff against Individual – Capacity Defendants

201.    Plaintiff realleges and incorporates paragraphs 1 through 200 and 207 through 214 as if fully set forth herein.

202.    The Eighth Amendment to the U.S. Constitution, as incorporated against States through the Fourteenth Amendment, guarantees that prisoners may not be subjected to cruel and unusual punishment by State actors. Specifically, prisoners in state custody have a right to medical treatment for their serious medical needs. This includes treatment in a reasonable time frame to not cause further harm and from professionals trained in the fields of treatment that is to be evaluated and provided to any

particular prisoner, including the plaintiff. Here, Defendants were deliberately indifferent to the rights of

Plaintiff to be given a surgery to repair the fracture of the Navicular bone in his right-dominate-hand

within a reasonable amount of time, let alone, any follow-up treatment, physical therapy or pain

medications for pain management, which has ultimately caused him to lose approx. 40% of the overall

function of his right-dominate-hand and which he currently suffers substantial physical and

mental/psychological harm and pain from. Even to the point of lying to the plaintiff as to the seriousness

of his injury. Only providing such information to the plaintiff after being specifically directed to do so

by an "out-of-house" specialist, while also, failing to follow that specialist's directives for treatment

and/or surgery. All of which was only compounded by the Defendants', and each of them', actions,

retaliatory actions, failures, negligence, outright deliberate indifference and callous disregard to

Plaintiff's serious medical needs and overall safety and security as described above and throughout this

complaint, violating his Constitutional rights and he has suffered irreparable harm and prejudice as a

result. Defendants therefore acted in violation of the Eighth Amendment. Among other things,

Defendants, and each of them,

     (a)    lied to plaintiff concerning the severity of the injury to his right-dominate-hand and doing so, in order to forego the costs of providing the plaintiff with the necessary surgery to repair the breakage of the Navicular bone in his right-dominate-hand;

     (b)    failed to follow or adhere to the recommendations of Dr. Carpenter to have the plaintiff sent out to his office for surgery within the week;

     (c)    failed to send the plaintiff out for surgery in a reasonable (within 10-14 days) amount of time;

     (d)    failed to provide the plaintiff with sufficient and alternative pain medication

before and after surgery, despite recognizing the need for such at certain points throughout this entire issue, case and since the breakage of Plaintiff's right-dominate-hand in April of 2021;

(e)    failed to, and, at the time of the filing of this First Amended Complaint, continues to fail to provide the plaintiff with follow-up care like physical therapy to help mitigate the possibility of any further damage or on-set arthritis and carputunnel;

(f)    failed to, and, at the time of the filing of this First Amended Complaint, continues to fail to provide the plaintiff with any accommodations, let alone, ADA accommodations such as a NEO device or 11" Securebook to aide him in his daily activities and life to ease the burden of his disabilities associated with the injury and the damage done to his right-dominate-hand;

(g)    failed to, and, at the time of the filing of this First Amended Complaint, continues to fail to properly document the Plaintiff's injury and disabilities associated with it causing the plaintiff to be refused any accommodations, let alone, ADA accommodations and subjecting him into forceful placement in work details causing him irreparable harm, pain and suffering;

(h)    blatantly ignored Plaintiff's pleas to not force him into doing work that could cause him irreparable harm as described throughout this complaint and, instead, treated the plaintiff as nothing more than a prisoner, slave and liar in forcing him to work in the face of threats of disciplinary sanction and solitary confinement;

(i)    failed to, and, at the time of the filing of this First Amended Complaint, continues to fail to have the plaintiff evaluated by an Orthopedic Specialist, Physical Therapist and/or Hand Specialist/Surgeon; and,

(j)      failed to promptly and continuously ensure that the plaintiff received timely and appropriate medical treatment and care for the injury and disabilities associated with the injury for Plaintiff's right-dominate-hand;

(k)      failed to protect the plaintiff from retaliatory actions as described above and throughout this complaint; and,

(l)      failed to, and, at the time of the filing of this First Amended Complaint, continues to fail to stop any of the Defendants or other prison officials or affiliates, from retaliating against the Plaintiff for raising these issues, filing grievances and ultimately, this lawsuit and the actions and/or failures claimed throughout this First Amended Complaint, which includes, but not limited to, the loss of his job, the denial of and/or restricted access to the Defendants' law libraries, which confines Plaintiff's legal work stored on a digital device, unwarranted, unwanted and unnecessary retaliatory prison transfers and being forced to work in an unsafe environment with deliberate indifference and callous disregard to the Plaintiff's overall serious security and medical concerns potentially, if not, causing him irreparable harm and psychological trauma.

203.    In doing so, Defendants, and each of them, acted with callous disregard for the rights, serious medical needs, physical and psychological safety and overall wellbeing of Plaintiff.

204.    Furthermore, by operating and continuing to operate facilities that allow prison officials to openly retaliate against its AIC population for seeking medical treatment, filing grievances, lawsuits and for trying to seek redress of their issues in the courts, violated the rights of Plaintiff's Constitutional rights. In doing so, Defendants, and each of them, acted with callous disregard for the rights, serious medical needs, physical and psychological safety and overall wellbeing of Plaintiff.

205.    As to Damages, Plaintiff who has lost approx. 40% of the overall usage of his right-dominate-hand, suffered irreparable harm, pain, suffering, psychological trauma, loss of job and financial stability, is entitled to damages against the Defendants, and each of them, for pain and suffering and harms and losses resulting from the Defendants', and each of them', actions, failures, maliciousness, deliberate indifference and outright heinous negligence as described above and throughout this complaint. Plaintiff is further entitled to an award of punitive damages in an amount to be proven at trial.

206.    Plaintiff is entitled to recover attorney's fees. 42 U.S.C. § 1988.

**Claim 2**
**Negligence**
**Damages Against All Defendants**

207.    Plaintiff realleges and incorporates paragraphs 1 through 206 and 210 through 214 as if fully set forth herein.

208.    Defendants, and each of them, were negligent in one or more of the following ways that caused harm, if not, irreparable harm, to Plaintiff:

(a)    In failing to initially, properly and truthfully inform the plaintiff concerning the severity of the injury to his right-dominate-hand;

(b)    In failing to follow or adhere to the recommendations of Dr. Carpenter to have the plaintiff sent out to his office for surgery within the week;

(c)    In failing to send the plaintiff out for surgery in a reasonable (within 10-14 days) amount of time;

(d)    In failing to provide the plaintiff with sufficient and alternative pain medication immediately upon confirming the breakage of Plaintiff's right-dominate-hand and throughout this entire ordeal, despite recognizing the need for such at certain

points throughout this entire ordeal, case and since the breakage of plaintiff's right-dominate-hand in April of 2021;

(e)    In failing to provide the plaintiff with follow-up care like physical therapy to help mitigate the possibility of any further damage, loss of movement or on-set arthritis and carputunnel in the Plaintiff's right-dominate-hand;

(f)    In failing to provide the plaintiff with any accommodations, let alone, ADA accommodations such as a NEO device or 11" Securebook to aide him in his daily activities and life to ease the burden of his disabilities associated with the injury and damage done to his right-dominate-hand;

(g)    In failing to properly document the Plaintiff's injury and disabilities associated with it causing the plaintiff to be refused any accommodations, let alone, ADA accommodations and subjecting him into forceful placement in work details causing him irreparable harm, pain and suffering;

(h)    In failing to acknowledge Plaintiff's pleas to not force him into doing work that could cause him irreparable harm as described throughout this complaint and, instead, treated the plaintiff as nothing more than a prisoner, slave and liar in forcing him to work in the face of threats of disciplinary sanction and solitary confinement;

(i)    In failing to have the plaintiff evaluated by an Orthopedic Specialist, Physical Therapist and/or Hand Specialist/Surgeon;

(j)    In failing to promptly and continuously ensure that the plaintiff received timely and appropriate medical treatment and care for the injury and disabilities associated with the injury to Plaintiff's right-dominate-hand;

(k)  In failing to protect the plaintiff from retaliatory actions as described above and throughout this complaint; and,

(l)  In failing to stop any of the Defendants or other prison officials or affiliates, from retaliating against the Plaintiff for raising these issues, filing grievances and ultimately, this lawsuit and the actions and/or failures claimed throughout this First Amended Complaint, which includes, but not limited to, the loss of his job, the denial of and/or restricted access to the Defendants' law libraries, which confines Plaintiff's legal work stored on a digital device, unwarranted, unwanted and unnecessary retaliatory prison transfers and being forced to work in an unsafe environment with deliberate indifference and callous disregard to the Plaintiff's overall serious security and medical concerns potentially, if not, causing him irreparable harm and psychological trauma.

209.  Plaintiff suffered harm as a result of Defendants' negligence, including irreparable harm, pain, suffering, disability, and permanent injury resulting in economic and non-economic damages in amounts to be proven at trial.

## Claim 3
### Violation of First Amendment
### Retaliation
### (42 U.S.C. § 1983)

### Plaintiff against Individual – Capacity Defendants

210.  Plaintiff realleges and incorporates paragraphs 1 through 209 as if fully set forth herein.

211.  The First Amendment to the U.S. Constitution, as incorporated against States through the Fourteenth Amendment, guarantees that prisoners may not be subjected to forms of retaliation, including

retaliatory prisoner transfers, for the filing of their grievances, lawsuits or other legal filings seeking redress in the courts. Nor their actions to seek medical treatment and/or protection from prison officials whom willfully and intentionally put their lives in harm' way or, in the very least, at a substantial risk of serious physical and psychological injury, illness, irreparable harm and/or death.

212.    Defendants, and each of them, intentionally and with deliberate indifference, nefarious and malicious intent and with callous disregard to the rights of Plaintiff, his serious security and medical concerns, acted in a targeted campaign of retaliatory actions against the plaintiff for his protected conduct as a prison advocate and for the filing of his grievances, this lawsuit and subsequent filings over these issues aimed at *interfering* with, and in an effort to *chill*, his abilities to seek redress and access the courts in his own case, acted in violation of the First Amendment. Among other things, Defendants, and each of them, have:

(a)    'actively interfered' with Plaintiff's ability to access-the-courts;

(b)    prevented and/or restricted Plaintiff from accessing the TRCI's law library, which holds and maintains a substantial amount of Plaintiff's legal work and documents digitally stored on a thumb drive device, while also denying him any alternatives;

(c)    on several occasions denied Plaintiff access to the TRCI law library based on a non-official and made-up rule that limited the Plaintiff's access despite the amount of case work, cases (5-7), imminent deadlines, which resulted in substantial *interference* and was in fact, detrimental in the appellate process of one of Plaintiff's cases concerning his daughter in North Dakota.[22];

(d)    made up a non-official rule to prevent, limit, interfere and substantially hinder the Plaintiff's abilities to work on his legal work and access-to-the-courts;

---

[22] *See J.R. v. North Dakota*, Case No. 22-5272.

(e)     taken actions that have led to the plaintiff being separated from his legal work for substantial periods of time and resulting in his legal work, documents, exhibits, etc., being mixed together with approx. 5-7 other cases and the complications and suffrages associated with that;

(f)     caused the plaintiff to lose his job, which has also resulted in plaintiff being overlooked for varying other positions of high repute within TRCI, including the refusal to hire him back in OCE Laundry, a position that he was employed for approximately five plus years and was promised to be given back;

(g)     maliciously and discriminatorily refused any work detail to the plaintiff causing him financial and psychological harm;

(h)     continuously denied the processing of Plaintiff's grievances for varying procedural grounds concerning his access to the law library (his digitally stored legal work and access-to-the-courts) as well as his medical complaints over the very issues addressed in this case;

(i)     through threats of disciplinary consequences and solitary confinement, forced Plaintiff to work in an unsafe and potentially hazardous environment likely to cause him irreparable and psychological harm; and,

(j)     unwantedly and unnecessarily in a collaborated retaliatory effort to *interfere* with and *chill* the Plaintiff's rights to seek redress of his grievances in the courts, if not cause him *irreparable* and *psychological* harm, transferred plaintiff to its most unsafe and only penitentiary in the State, OSP, in direct contradiction, with deliberate indifference, nefarious and malicious intent and callous disregard to Plaintiff's security and medical concerns, commonly known amongst the AIC

population and staff alike, as "Diesel Therapy".

213.    All of the above was done in retaliation for Plaintiff's assistance in the *Maney* Class, the *Hanna v. Peters* (Or. D. 2022) case, Plaintiff's filing of grievances, especially against the TRCI's law library and medical personnel as well as Plaintiff's own COVID-19 § 1983 Federal Lawsuit, *Ross v. Blewett*, et. al., Case No. 2:20-cv-01338-SB, and, specifically, this case at hand. All of the above amounts to a targeted campaign of government retaliation orchestrated at every step by the Defendants, and each of them, as punishment for Plaintiff's protected speech and rights that has threatened and jeopardizes his physical and psychological wellbeing, overall safety and economic future violating his Statutory and Constitutional rights causing him to suffer from prejudice and irreparable harm as a result.

214.    Plaintiff suffered harm, if not irreparable harm, as a result of Defendants' actions and is entitled to an award of punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

215.    State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims:

> *In simple terms, for all of the reasons above, I am entitled to compensatory damages against the Defendants, and each of them, for pain and suffering and harms and losses resulting from their actions, inactions, deliberate indifference, negligence and outright failures as outlined and described throughout this complaint in amounts to be proven at trial. I am further entitled to an award of punitive damages in amounts to be proven at trial. I also request reasonable attorneys' fees and costs and I demand a jury trial for all matters triable of right to a jury. However, in a good faith effort, as I am not an attorney, as more specifically laid out below:

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.    Injunctive relief in the following particulars:

(a)     Order Defendants to send the plaintiff out to a qualified local Orthopedic Specialist to re-evaluate the injury and recovery of his right hand. This would include any evaluation of loss or disability in his right hand and any need for additional surgery and/or treatment. This would also include any evaluation as to whether or not the screw is displaced or causing plaintiff pain and whether or not, it should be removed;

(b)     Order Defendants to provide plaintiff with a qualified local Physical Therapy Specialist, to re-evaluate the injury and recovery of his right hand. This would include any evaluation of loss or disability in his right hand and the need for any physical therapy treatment;

(c)     Order Defendants to send plaintiff out to a qualified local Specialist, to evaluate the injury and recovery of his right hand. This would include any evaluation of loss or disability in his right hand and whether or not any arthritis and/or carputunnel has set in;

(d)     Order Defendants to adhere to and due follow-up care as recommended by any of the specialist evaluating the Plaintiff's injury and disabilities associated with the injury to the Plaintiff's right-dominate-hand;

(e)     Order Defendants to provide plaintiff with an alternative pain medication that is not as harmful as the long-term usage of Ibuprofen and Tylenol, yet, and hopefully, more effective than Ibuprofen and Tylenol for Plaintiff's constant swelling and pain management;

(f)     Order Defendants to acknowledge Plaintiff's injury, loss and disabilities in and of his right-dominate-hand as applied and qualifying under the ADA for special

needs;

(g)    Order Defendants to provide plaintiff with the necessary tools, equipment, etc.,
       needed to aid the rehabilitation, physical therapy and overall medical care of
       Plaintiff's right-dominate-hand;

(h)    Order Defendants to provide plaintiff with accommodations like extra time to
       meet timelines in any of his filings, grievances, legal matters and other daily
       activities that require the usage of his right-dominate-hand and that would put
       undue stress and strain on his right-dominate-hand causing him additional harm,
       pain and suffering;

(i)    Order Defendants to provide plaintiff with an 11" Securebook (Laptop) with
       "Dragon" software, which is a speak-to-type software that would substantially
       reduce the strain and pain caused to his right-dominate-hand. This product is
       provided by JusticeTechSolutions.com and is specifically designed and built from
       the ground up, for AIC use in the prison environment. In fact, it is a device that
       has already been, and, currently is, being afforded to and used by many other AICs
       throughout TRCI and ODOC facilities under the ADA. The main purposes and
       intents of Plaintiff's usage of this device, would be for his person to be able type
       any letter, document, grievance, etc., that exceeds 1 sentence in length. This would
       also include any usage for typing and storage of any and all of Plaintiff's past,
       present and future legal work and filings and this device would be Plaintiff's
       personal property, just as with all other AICs whom currently possess one;

(j)    Order Defendants to provide plaintiff with persons/medical staff that are
       professionally trained and licensed in the particular fields of which they are

**Page 56 of 59 FIRST AMEDED CIVIL COMPLAINT          James Arthur Ross, S.I.D.#12599830**

evaluating and treating the plaintiff;

(k)    Enjoin Defendants, their successors in office, agents, and employees and all other persons acting in concern, association and participation with them, to immediately stop forcing the plaintiff to work. Especially, in work detail that reasonably can and will cause the plaintiff to suffer further pain and/or permanent damage to the injury of his right dominant hand;

(l)    Allow plaintiff to obtain work that he feels comfortable in being able to perform due to the disabilities of his right dominant hand;

(m)    Order the Defendants, their successors in office, agents, and employees and all other persons acting in concern, association and participation with them, to acknowledge the passage of Ballot Measure 112 ending slavery and involuntary servitude in Oregon's prisons and to stop forcing the plaintiff to work in the face of threats of disciplinary sanction and solitary confinement if he does not;

(n)    Order the Defendants, their successors in office, agents, and employees and all other persons acting in concern, association and participation with them, to stop any and all retaliatory actions towards the plaintiff, including unnecessary and unwanted prison transfers; and,

(o)    Any other remedy the Court sees just and fit to address the constitutional violations outlined above;

B.    On all of Plaintiff's claims for relief as described above and throughout this complaint, compensatory damages for pain and suffering and harms and losses in amounts to be proven at trial;

C.    On all of Plaintiff's claims for relief as described above and throughout this complaint, an

award of punitive damages in amounts to be proven at trial;

D.    Reasonable attorneys' fees and costs;

E.    Such other relief as the court deems just and proper; and

F.    Finally, Plaintiff demands a jury trial for all matters triable of right to a jury.

**DATED** this 24th day of January, 2024.

Respectfully Submitted By:

James Arthur Ross, appearing pro se'
S.I.D.#12599830
Two Rivers Correctional Institution
82911 Beach Access Rd.
Umatilla, Or 97882

**VERIFICATION**

STATE OF OREGON          )
                         ) SS.
County of Umatilla       )

     I, James Arthur Ross, the Plaintiff in the foregoing Civil Complaint, state under oath, that I have

read and know the content of the Complaint, and I declare or verify under penalty of perjury that the

facts set forth are true and correct to the best of my knowledge and belief and that all of the documents

and exhibits included in, or attached to, the Complaint are authentic to the best of my knowledge and

belief.

 

(Signature of Petitioner)

**SUBSCRIBED** and sworn to before me this _24_ day of _January_ , 20_24_ .



OFFICIAL STAMP
JESSICA MARIE MUNOZ
NOTARY PUBLIC - OREGON
COMMISSION NO. 1040247
MY COMMISSION EXPIRES AUGUST 23, 2027

Notary Public for Oregon

My Commission Expires: _8/23/2027_

# CERTIFICATE OF SERVICE

**CASE NAME:** _____ Ross _____ v. _State, et al.,_ _____

**CASE NUMBER:** (if known) _2:23-cv-00515-SB_ _____

COMES NOW, _James Arthur Ross_ _____, and certifies the following:

That I am incarcerated by the Oregon Department of Corrections at Two Rivers Correctional Institution.  (TRCI)

That on the _24th_ day of _January_ _____, 20_24_, I personally gave Two Rivers Correctional Institution's e-filing service a true copy OF THE FOLLOWING:

| | |
|---|---|
| **1.** | First Amended Complaint. |
| **2.** | |
| **3.** | |
| **4.** | |
| **5.** | |
| **6.** | |
| **7.** | |
| **8.** | |
| **9.** | |

_____
(Signature)

Print Name: _James Arthur Ross_

SID #:     _12599830_